| | |
|---|---|
| **In the Matter of Arbitration**<br>**Between** | **Before:**<br>Ralph H. Colflesh, Jr., Esq., Arbitrator |

**MURRAY AMERICAN ENERGY INC.**
**MONONGALIA COAL COMPANY,**
**MONONGALIA COUNTY MINE**
    **and**
**DISTRICT 31, LOCAL 1702**
**UNITED MINE WORKERS**
**OF AMERICA**
(Grievance 1702-11-18: Subcontracting)

<u>Appearances</u>
For the Company:
*Timothy A. Baun,*
*Supervisor Employee Relations*
*St. Clairsville, Ohio*
For the Union:
*Dennis "Adam" Frey*
*Field Representative*
*Fairmont Office, UMWA District 31*
*Fairmont, West Virginia*

## DECISION AND AWARD

Pursuant to the terms of a Collective Bargaining Agreement ("the Agreement" (JX 1)[1] by and between the Employer signatories—Bituminous Coal Operators of America, including the Employer herein, Murray American Energy Inc. Monongalia County Mine ("the Company")—and International Union, United Mine Workers of America ("the Union"), the undersigned was appointed to hear and determine the dispute described below. Upon due notice an arbitration hearing was convened on April 27, 2018 at 9:00 a.m. at the Hampton Inn, Fairmont, West Virginia. At that time and place both parties had an opportunity to call and confront witnesses, introduce documentary and other non-testimonial evidence, and present arguments in support of their respective positions. At the conclusion of the hearing the parties presented summations, and the record closed. As there are no procedural issues, this matter is ready for adjudication.

---

[1] Exhibits admitted at hearing and referenced herein are designated as "JX_____" for Joint Exhibits and "CX_____" for Company Exhibits; and "UX_____" for Union Exhibits.

Exhibit A

**Background:**

The Company owns and operates a bituminous coal mining operation known as the Monongalia County Mine in Monongalia County, West Virginia where it employs about 282 workers in a collective bargaining unit represented by the Union. Terms and conditions of employment for that unit are set forth in the Agreement, which among other provisions, contains a grievance procedure for the resolution of disagreements over the interpretation or application of the Agreement's terms. (JX 1, p. 267). Those grievances that cannot otherwise be resolved may be referred to "final and binding" arbitration. (JX 1, p. 269-270, 271).

On or about January 22, 2018, the Union filed a grievance through its member Tim Gibson, who is employed at the mine as a longwall worker. (JX 2). According to Mr. Gibson's unrebutted testimony, he was working at the mine on a voluntary overtime basis on Sunday January 21, 2018 when he was informed by a foreman that a subcontractor's employees (hereinafter "subcontractors") were arriving that day and that Mr. Gibson should prepare the worksite for them by moving cable and a high-lift machine so the subcontractors could unspool, hang and tie down cable onto a trolley system that is suspended from the roof of the mine. Mr. Gibson complied and subsequently 6 subcontractors arrived and performed the same work Union minors have traditionally done, and in fact did do, in that area of the mine the preceding week and on the following Monday, January 22, 2018.

It is undisputed that for prior to January 21, 2018, the Company had posted a request for bargaining unit volunteers to "run coal" that day in the 10W panel area. (CX 4). The request for volunteers was necessary because the Agreement at Article IV, Section (e), (JX 1, pp. 47-48) makes Sunday work for all Union employees optional. Initially the request produced 12 volunteers (CX 4), including Mr. Gibson, but ultimately Mr. Gibson and 12 other employees were approved to work. (CX 5). Presumably all did work on the same shift as Mr. Gibson while 11 other employees worked the January 21 midnight shift and 5 more worked the afternoon shift.(CX 6).

In all, Mr. Gibson worked a total of 14.25 hours that day, earning $866.83. Combined with his overtime pay for Saturday and his base rate and overtime for all five weekdays, Mr. Gibson earned a total of $3,794.52 for the week of January 15 through January 21, 2018. (CX 3).

2

The basis of the grievance is the Union's claim that the Agreement prohibits the Company from using subcontractors for the work they performed on January 21, 2018. The Union relies on Article IA, Sections (a), (g) (2), and (i).

Section (a) states:

The production of coal, including the removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by [the Company], repair and maintenance work normally performed at the mine site or at a central shop of the [Company] and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above *shall be performed by classified Employees of the [Company] covered by and in accordance with the terms of this Agreement.* Contacting, subcontracting, leasing and subleasing and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers. (Emphasis supplied). (JX 1, pp. 3-4).

Section (g) (2) states in pertinent part:

Repair and Maintenance Work—Repair and maintenance work of the type customarily performed by classified Employees at the mine or central shop *shall not be contracted out* except (a) where the work is being performed by a manufacturer or supplier under warranty…; or (b) where the [Company] does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop) with necessary skills available to perform the work at the mine or the central shop. (Emphasis supplied). (JX 1, p. 7).

Section (i) states in pertinent part:

> All Construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the [Company] normally performing construction work in or about the mine in accordance with prior practice and custom, *shall not be contracted out at any time* unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules…(Emphasis supplied). (JX 1, p. 8).

These same sections were cited by the Union in a prior case involving the same mine and similar work, *Murray American Energy, Inc., The Monongalia County Coal Co. Monongalia County Mine and United Mine Workers of America District 31 Local Union 1702* (January 5, 2018) decided by Jacquelin F. Drucker, Esq. (UX C). That case involved the extension, by 300 feet, of an existing 900 foot overhead monorail system which the Company had moved from a depleted long wall panel of the mine to a new panel that the Company was ready to mine. The extension was necessary because the new panel was 1200 feet long. Between April 2 and April 6, 2016 the Company used a contractor instead of bargaining unit employees to add the extra 300 feet. At the arbitration hearing the Assistant Superintendent of the mine testified that the subcontracted work had customarily been performed by bargaining unit members. He also agreed those members were qualified and capable to do the same work again. A Union witness corroborated that testimony and further testified that the work had customarily been done by Union personnel. Mr. Gibson, the same Grievant who filed the instant matter, testified he himself had worked on reinstallation of the monorail many times in the past. (Id. p 14).

Arbitrator Drucker undertook an admirably careful review of many subcontracting decisions rendered by esteemed arbitrators in the coal industry, including Arbitrator Phelan in *Sunnyside Coal Company, Sunnyside Mine and UMWA, District 22, Local 9958* (Case No. 88-22-92-76 (1993); Arbitrator Nicholas *in The Pittsburgh & Midway Coal Mining Company, North River Mine and UMWA, District 20, Local 1926,* Case No. 02-20-05-060 (2005); Arbitrator Dissen in *Southern Ohio Coal Company and UMWA District 31, Local 1949, Case No. 88-31-89-180* (1989); and, Arbitrator Berman in *McElroy Coal Company and UMWA, District 6, Local*

*1638, Case No. 88-6-91-699* (1991). The result of her review convinced her that under the Agreement:

 (a) the Union exclusively performs work in the mines unless the work meets the exemptions set forth in Sections (g) (2) or (i) of Article IA;

 (b) Section (g) (2) does not extend to any new work and only covers repair, replacement, restoration or preventative measures; and,

 (c) Section (i) only covers the erection, fabrication or installation of things that was not "customarily performed" by the bargaining unit "in the mine in accordance with prior practice and custom."

 Applying those conclusions about the Agreement, Arbitrator Drucker determined that the work done by subcontractors in her case—the tearing down, movement, and reinstallation of the longwall monorail system—was neither repair work nor construction work within the meaning of Sections (g) (2) and (i) of Article IA and therefore under Section (a), the work was exclusively the Union's and had been improperly subcontracted. She issued an Award that included a cease and desist order as to the subcontracting of "this work" *and* an award of pay at Mr. Gibson's straight time rate for all hours worked by the subcontractors on the project in question.

 Ms. Drucker left to the parties the calculation of that amount and retained jurisdiction to resolve any disputes over the calculation. At the time of the subcontracting she considered Mr. Gibson was working full-time and substantial overtime and was fully employed by the Company and was working during the four days the subcontractors were at the mine.

 The Company has appealed Arbitrator Drucker's decision under the federal Uniform Arbitration Act on the grounds she had no authority to grant a monetary remedy to Mr. Gibson because there was no proof Mr. Gibson had been harmed by the subcontracting. (UX D). In its Complaint to Vacate, the Company avers that under the circumstances, any relief to Mr. Gibson was purely speculative, undeserved, and completely baseless as a "make whole remedy" because Mr. Gibson personally was not harmed by the subcontracting. (UX D, p. 4).

 In the present case, the Company does not even assert the work done by the subcontractors on January 21 was within the Section (g) (2) repair or Section (i) construction exemptions to the Union's general work jurisdiction set forth in Section (a). Instead, the

Company's position is that all employed bargaining unit personnel who wanted to work January 21—including Mr. Gibson—did so and therefore no Union employee was displaced by a subcontractor. The Company further reasons that its decision to subcontract the work that day is nowhere expressly prohibited by the Agreement and that even if it were, there can be no remedy because the Union cannot show any of its members were damaged.

**Issue to be Determined**:

My review of the record and arguments convinces me that the issue to be determined in this case is the following:

Did the Company violate the Agreement when it subcontracted work on January 21, 2018 for the unspooling, hanging, and securing of cables on the 10W panel of the mine; and, if so, what shall be remedy be?

**Arguments of the Union:**

The Union's argument is threefold in this matter.

First, the Union argues that the Company improperly subcontracted work on January 21, 2018. The cable unspooling, distribution and securing was work that has historically been done by the bargaining unit and was, in fact, performed by Union workers the same week as the subcontractors worked, as testified to without rebuttal by Mr. Gibson. That work, besides being within the Union's work jurisdiction pursuant to Article IA Section (a), did not meet the exceptions that allow subcontracting found in Article IA, Sections (g) (2) regarding repair and maintenance work or Section (i) regarding construction work.

In support of that claim the Union directs attention to a great many arbitration awards including that of Arbitrator Hewitt in *The Monongalia County Coal Co. and United Mine Workers of America, District 31, Local Union 1702* (March 16, 2018) (Company could not meet the Section (g) (2) exception); Arbitrator Drucker in *Murray American Energy, Inc., The Monongalia County Mine and United Mine Workers of America District 31 Local Union 1702*

6

(March 11, 2018) (no Section (g) (2) Section protection for the Company); Arbitrator Gerhart in the *Monongalia County Coal Company Monongalia County Mine and United Mine Works of America District 31, Local 1702* ( June 8, 2017) (no protection under any exception to Article IA Section (a)'s general grant of bargaining unit work to Union); Arbitrator Phelan in *The Monongalia County Coal Company Monongalia County Mine and United Mine Workers of America District 31, Local 1702* (March 11, 2016) (no Section (g) (2) protection for the Company); Arbitrator Zobrak in *The Monongalia County Coal Company Monongalia County Mine and united Workers of America, District 31, Local Union 1702* (August 19, 2015) (no Section (i) protection for the Company); Arbitrator Allen in *Monongalia Coal Company and United Mine Workers of America District 31, Local Union 1702* (July 10, 2015) (no Section (g) (2) protection for Company); Arbitrator Wagman in *Consolidation Coal Company, Blacksville #2 Mine and Local Union 1702, District 31, United Mine Workers of America* (October 31, 2013) (no Section (i) protection for the Company; Arbitrator Felice in *Consolidated Coal Company Blacksville #2 Mine and UMWA, Local 1702* (January 27, 2012) (no Section (g) (2) protection for Company; Arbitrator Dene in *The Marion County Coal Company and United Mine Workers of America District 31, Local Union 9909* (September 20 , 2016) (no Section (i) protection for Company).

Although none of those cases involved the precise work presented in this case, the Union emphasizes that the Company does not even assert those Sections endorsed the subcontracting here.

Second, the Union contends Arbitrator Drucker's cease and desist order in her January 5, 2014 decision, should apply to this this case as well, notwithstanding that the exact tasks performed by subcontractors in her case was not the same as the work performed in the instant matter. In that argument, the Union relies on the doctrine of *res judicata* as it is applied in coal industry arbitrations.

That application of the doctrine was explicated by Chief umpire Paul Selby in *The North American Coal Corporation, Quarto No. 7 Mine and Local union 1941, District No. 6, United Mine Workers of America* (1980), referred to as Decision 78-24 of the Arbitration Review Board ("the ARB") established by the Union and the Bituminous Coal Operators of America. This is one in a series of decisions rendered under the 1978 national coal contract that the parties have

agreed are binding in all subsequent cases. (JX 1, p. 272). In ARB 78-24, Chief Umpire Selby first approvingly cited the elements of arbitral *res judicata* as set forth in *Southern Appalachian Coal Company, No. 1 Mine, and L. U. 1994, District 17, UMWA* (Sergent 1976) as (1) substantive identity between the issue presented the present case and the case on which the *res judicata* proponent relies; (2) involvement of the same contractual provisions; and, (3) identity of the parties involved. (*Id*, p. 9).

Other arbitrators have subsequently held that limitation on the doctrine's application will occur (1) where the award relied upon was clearly the result of bad judgment; or (2) was made without benefit of some key factors; or (3) was based on an obvious and substantial error of fact or law; or, (4) a full and fair hearing was afforded in the earlier case. (*Id.*, p. 16, citing *General Portland Cement Co.*, 62-2 ARB 8611 at 527 (Ray____). *Also see, United Coal Workers of America, Local union 7930, District 20 and Russell Coal Incorporated, Bankhead Mine* (pp. 14-17) (Selby 1990).

Third, the Union makes a strong argument that the appropriate remedy in this case is monetary compensation to be paid to the Grievant, Tim Gibson. Although Mr. Gibson suffered no actual loss, the Union holds that damages should be paid under the theory that the subcontracting alleged here involves lost work opportunity. Beside Arbitrator Drucker's decision, cited above, the Union relies, among others, on a 2012 decision by Arbitrator John M. Felice in which he awarded bargaining unit personnel at total of $107, 233. 80 as a remedy after he held the Company had improperly allowed subcontractors to work 4, 695 hours. In doing so, Arbitrator Felice cited many prior arbitration awards in which monetary compensation was paid without any knowledge on the part of the awarding arbitrator as to which employees in particular were actually "harmed." Included was an award by Arbitrator Moscovitch in Case No 07-31-11-098, September 2011; Babiskin in Case No. 07-31-08-032, February 23, 2009; Arbitrator Phelan in KD-17-99-27, October 2005; Arbitrator Shelby in Case No. 88-12-90-090, May 18, 1990); and Arbitrator Duff (no case identified) September 19, 1984).

Further, the Union cites Arbitrator Wagman in *Consolidation Coal Company, Blacksville #2 Mine, supra*, 2013; Arbitrator Trombetta in *United Mine Workers of America Local 1702 and Monongalia Country Coal Co.* (2014); Arbitrator Zobrak in *Monongalia County Coal Company Monongalia Mine, supra*; Arbitrator Drucker in Case No 11-31-16 338 (*supra*) (2018);

Arbitrator Ruben in *United Mine Workers of America, District 31, Local Union 9909 and Consolidation Coal Company Loveridge Mine # 22* (2006); Arbitrator Williams in *United Mine Workers of America and Consolidation Coal Company, Loveridge Mine* (2009); Arbitrator Widgeon in *Consolidation Coal Company Loveridge and Local 9909, District 31, UMWA* (2013). In each of those cases, arbitrators awarded monetary damages where subcontractors were found to have performed work reserved to the Union under Article IA. In some of these cases the arbitrators could not determine which bargaining unit members in particular were harmed and awarded the monetary damages to the Union or the employees generally in the affected classifications. *E. g.,* Felice Award; Moscovitch Award; Wagman award; Trombetta Award; Zobrak Award.

Of particular interest for the Union is the Drucker Award in which that arbitrator found that *all* Union employees who wanted to work during the hours impermissible worked by the subcontractor should be compensated. Nevertheless Arbitrator Drucker awarded each of the named grievants in that case an equal amount at base rates for all hours worked by the subcontractors even without a showing they were individually harmed.

**Arguments of the Company:**

The Company begins by denying that Arbitrator Drucker's 2018 award is *res judicata* as to the current dispute. Citing ARB 78-24, the Company asserts that the work subcontracted in the Drucker decision and the work done in instant case are so different that no *res judicata* ruling can be applied. Specifically, the Company says that the instant case involved cable extension while the Drucker matter dealt with an extension of the mine's monorail system. The Company cites Arbitrator Phelan for the principle that not all work in a mine is to be considered as one, even though all involve production of coal either directly or indirectly. *Consolidation Coal Company and UMWA Local Union 9909, District 31,* (Phelan 1992). *Accord, Marion County Coal Company and UMWA Local Union 9909, District 31,* (Allen 2015). Because the work was substantially different in the present case as opposed to the work in Arbitrator's case, application of *res judicata* would be erroneous.

The Company next argues that Mr. Gibson, the Grievant herein, suffered no loss attributable to the subcontracting and therefore he is disqualified from receiving any monetary compensation. The Company cites another decision by Chief Umpire Paul Selby, ARB No. 78-16, in which that esteemed neutral wrote:

> Back pay awards in arbitration are, in reality, analogous to "monetary damages" for breach of contract in other employment contract situations. Both in arbitration and at law, "monetary damages" are compensatory only, and are not punitive. That is, a monetary award is limited to an amount which, so far as money can achieve, it, will compensate the aggrieved party for losses suffered as a result of the breach of the Agreement. (Id. p 2-3).

Further in ARB 78-26, Arbitrator Selby explained that in order for monetary compensation to be awarded to a grievant, the grievant must show he had a right to the work involved, he was deprived of that work, and his loss can be shown with a reasonable degree of certainty. (*Id.* pp. 16-17); *accord,* ARB 78-60 (Chief Umpire Richard Bloch 1981). The Company holds that any monetary award not based on those principles is effectively a punitive damage award for which there is no basis in labor arbitration, citing *Consolidation Coal Company and UMW Local Union 5429, District 31* (Joseph 1983) and *The Ohio Valley Coal Company and UMWA Local Union 1810, District 6, pp. 6-7* ("arbitration law is clear that when monetary damages are awarded, the loss must be specific and determinable") (Palmer 2002). Similarly, the Company cites the same Palmer award for the teaching that that punitive damages are disallowed in arbitration. That rule has been established in ARB 78-16, in which it was held that arbitration awards cannot order punitive damages and was followed by Arbitrator Allen in *Marion County Coal Company and UMWA Local 9909, District 31*, pp. 15, 16 (2016) and reinforced by Arbitrator Phelan in *Marion County Coal Company and UMWA Local Union 9909, District 31,* pp. 6, 9-10 (2016) and by Arbitrator Franckiewicz in *Harrison County Coal Company and UMWA Local Union 1501, District 31.* Also see, *Oak Grove Resources and UMWA Local Union 8982, District 20,* (Phelan 2009); *Monongalia County Coal Company and UMWA Local Union 1702, District 31,* (Wilson 2016); *Monongalia County Coal Company and UMWA Local Union 1702, District 31,* (Phelan 2016).

In addition, the Company cites federal appellate and trial court decisions holding that arbitration awards must draw their essence from the words of the contract creating the arbitrator's jurisdiction and further directing that where there is no legally cognizable loss that is either manifestly monetary or measurable in monetary terms, any damages must be viewed as punitive and, if not authorized under the contract, set aside. *Westmoreland Coal Company and UMWA Local Union 8181, District 28*, (4th Cir. 1983). The same result was reached in *Cannelon Industries and UMWA Local Union 8843, District 17*, (1991 USDC SDWVa.), and *Baltimore Regional Joint Board, Amalgamated Clothing Workers of America v. Webster Clothes, Inc.*, (4th Cir. 1979).

Lastly, the Company argues there should be no remedy where members of the bargaining unit knew there was work to be done but turned down the opportunity, leaving the employer to subcontract it. *Marion County Coal Company and UMWA Local Union 9909, District 31*, (Goldberg 2017); *Consolidation Coal Company, Blacksville No. 2 Mine and UMWA Local Union 1702, District 31*, (Zobrak 2013). In the same manner, where an employee is not "reasonably available" to perform subcontracted work there can be no monetary remedy to that worker. *Monongalia County Coal Company and UMWA Local Union 1702, District 31* (Allen 2016). In the case at bar, the Company points out, the subcontracted work was done on a Sunday—a day when the Agreement prohibits forced work by the bargaining unit—and after the Union work force was invited to sign up for Sunday work.

### Opinion:

As a preliminary matter, contrary to the Union's contention, this is not a case in which the *res judicata* doctrine can be applied. As explained by Arbitrator Selby in ARB 78-24, for the doctrine to apply there must be an identity as to issues, an identity of parties; and, an identity of pertinent contractual provisions. Here, while the second and third "identities" are satisfied, the factual issue involved is different. In the Drucker Award the question was whether a tear down, removal, and reconstruction of part of the mine's monorail system was permitted subcontracting. In the present matter, the work involved the distribution and hanging of trolley, cable, and wires. These jobs are sufficiently dissimilar that under the binding precedent of ARB 78-24 I cannot find an identity of issue and so must reject the Union's *res judicata* argument.

However, even without application of *res judicata*, there can be no doubt that subcontracting took place in this case and that it was prohibited by the Agreement. As explained above, Article IA, Section (a) states the Union's general work jurisdiction. Under it, production of coal, to which the mine's overhead trolley, cable, and wire system contributes, is work that is—as Mr. Gibson attested to without contradiction—customarily performed by the bargaining unit. Further, that work cannot be considered as an exception to the general no-subcontracting rule expressed in Section (a) because it does not fit under either Section (g) (2) or Section (i) of Article IA.

As correctly argued by the Union, Section (g) (2) would not apply here because the work done by the subcontractors on January 21, 2018 was not maintenance and repair work. As seen above in the Drucker Award, which also denied the Company Section (g) (2) protection, such work must involve "fixing or servicing existing machinery and equipment, and…[be] done for the purpose of restoring it to proper working order or keeping it in good working order", citing Arbitrator Phelan as quoted by Arbitrator Nicholas in *The Pittsburgh & Midway Coal Mining Company, North River Mine and UMWA, District 20, Local 1926,* Case No 02-20-05-060 (Nicholas 2005) p. 14. (Drucker Award, *supra* at 9). Obviously, the work done by the subcontractors in the present case had nothing to do with repair or maintenance as understood by my predecessors. Therefore, none of the conditions that would permit subcontracting under that Section can be satisfied.

Nor can the work qualify as permissible subcontracting under Section (i). The work simply does not qualify as "construction work" as that that term has been interpreted and applied by coal industry arbitrators. *See,* Arbitrator Phelan in *The Monongalia County Coal Company Monongalia County Mine and United Mine Workers of America District 31, Local 1702* (March 11, 2016); Arbitrator Allen in *Monongalia Coal Company and United Mine Workers of America District 31, Local Union 1702* (July 10, 2015); Arbitrator Felice in *Consolidated Coal Company Blacksville #2 Mine and UMWA, Local 1702* (January 27, 2012) protection for Company.

I make the foregoing findings about the nature of the work done here and the limits of Section (g) (2) and Section (i), not because the Company asserts either of them as a rationale for its decision to use subcontractors on January 21, 2018. Indeed, the Company foreswears any

invocation of those Sections. My findings are set forth here to leave no doubt as to the appropriateness for some remedy.

As to that remedy, the Company argues that every monetary remedy must be intended to rectify a proven loss. The keystone to the Company's premise is ARB No. 78-16 (Selby, 1979), in which that venerable arbitrator wrote, "Back pay awards in arbitration are, in reality, analogous to 'monetary damages' for breach of contract in other employment contract situations…and are not punitive."). (pp. 2-3). The Company further offers other precedential awards on the same issue, including ARB 78-26 (Selby 1980). More specifically, the Company insists that where there has been improper subcontracting, such damages must be ascertainable and paid only to workers who are shown to have been directly and adversely affected by the subcontracting. ARB 78-26, *supra*; *The Ohio Valley Coal Company and UMWA Local Union 1810, District 6* (Palmer 2002). More importantly, the Company argues that a monetary remedy cannot be paid to a union, citing ARB 78-26. Damages could only be paid to the Union, the Company maintains, where there is contractual authority for the same, *Jim Walter Resources, Inc. and UMWA Local Union 1928, District 20* (1993), as cited in *Ohio Valley Coal Company, supra* at 7; *Marion County Coal Company and UMWA Local Union 9909, District 31* (Phelan 2017). The net result is, according to the Company, in no event can a monetary remedy be awarded unless that remedy is paid to an individual or individuals for a loss that person or persons suffered because of the subcontracting. Otherwise, according to the Company, the remedy would not draw its "essence" from the contract, a universal requirement for labor arbitration awards generally. *Baltimore Regional Joint Board, Amalgamated Clothing Workers of America and Webster Clothes, Inc. (4th Cir 1979).*

The sum of the Company's contention on this point is that there are contractual violations that must go without a remedy, and this case presents one.     `

I think the Company paints with too broad of a brush.
First, the 4th Circuit's assertion in *Baltimore Regional Joint Board* that the "essence test," universally used in appellate review of labor arbitration decisions, applies to remedies is erroneous. The "essence test" is applied to an arbitrator's decision on questions of both procedure and the merits of a grievance. While a remedy clearly cannot contravene a contractual

dictate—and some contacts do restrict remedies in specific situations—very few labor agreements circumscribe remedies generally and for a very logical reason. Remedies rectify contractual violations; they are not part of the substance of the contract or procedural requirements. Negotiators and draftsmen to do contemplate breaches and address how they shall be corrected. Thus, there is generally no "essence" that a remedy could be drawn from.

    Certainly there is no general restriction on remedies in the Agreement here. In fact, the only restriction on remedies is found in Article XXIV, Section (f) which directs that where an unjust discharge is found the affected employee is to receive his lost wages at "his applicable straight and premium time rates prior to discharge." And even this provision does not restrain an arbitrator from providing further relief, such as forbidding use of the discharge from future personnel decisions, or awarding service time lost during the period of discharge.

    As the Union has argued, there is precedent in the coal industry of remedies being provided to a union where there is an improper subcontracting but no deserving and immediately identifiable grievant. Case No. 11-31-15-117 (Allen 2015); Case No. 07-31-08-032 (Babiskin 2009); Case No. 93-31-138 (Barrett 1997); Case No. 88-31-58- (Dissen 1991); _____ (Duff 1984); Case No. 11-31-14-062 (Trombetta 2014).

    Second, some of the binding awards which the Company says are part of the Agreement through Article XXIII, Section (k) (JX 1, p. 272) prohibit money damages to individual miners who were not shown to have suffered ascertainable losses and appear to have been rendered in cases where "back pay" damages were either awarded or sought for an individual or individuals. Other cases, *e. g.*, ARB 78-60, relate to situations in which damages were sought for the Union but where the Union was unable to calculate the amount it was seeking. But there is nothing in those awards that prohibit damages in general for breaches of the Agreement. Moreover, with all respect to Arbitrator Palmer in *The Ohio Valley Coal Company, supra* wherein he stated that "there is nothing in ARB Decision 78-26 or the agreement to authorize a monetary award directly to the Union," the lack of an express authorization is hardly the same as an explicit prohibition.

Third, an award that remedies an actual amount that should not have been lost is not punitive. Such awards are aimed at making a party whole for the other's breach and are thereby compensatory.

In this case, the Union suffered a loss because its contractual work jurisdiction was violated. The use of non-bargaining unit workers to do work that is covenanted to the Union erodes the Union's authority as the lawful representative of its members and effectively allows the Company to do that work at lower wages and benefits than are contracted for between the parties. When that violation occurred, the Union had a duty to the miners it represents to protest and prevent the further transfer of work away from its members. The Company argues that it tried to get Union workers but not enough signed up despite the very lucrative double-time rate paid for Sundays. But the Company has agreed with the Union that no miner shall be forced to work on the Sabbath, and that covenant cannot justify the transfer of work that the Union has historically done simply because some Union members availed themselves of their contractual right. Were this a health and safety or economic emergency, I would hold that it was impracticable for the Company to perform its contractual obligation to reserve the tasks for Union miners. The Company's able representative never made such a showing here for the obvious reason that none existed.

Based on the foregoing, I join Arbitrator Drucker in awarding damages to the Union for this breech, and concur with the principle implied in her award that in general every sustained grievance must have some remedy. At the same time, I depart from any thinking that Union members should be rewarded for not working when they had the opportunity. Rather, remedial compensation in this case should go to the Union only for the costs of prosecuting this grievance. Such costs shall be reasonable and shall be based on the documented fees, if any, the Union's legal team billed for the preparation of the grievance as well as the documented per hour cost of the work of Mr. Frey, who represented the Union here, that was spent preparing and presenting the case. That latter amount shall be calculated on his hourly salary as a Union staff member and based on a 40-hour work week. The cost shall not include any costs of witnesses, nor shall it include the Union's share of the undersigned's fees and expenses, as those must contractually be divided equally by the parties.

## Award:

The grievance is sustained. The Company violated the Agreement when it subcontracted work on January 21, 2018 for the unspooling, hanging, and securing of cables on the 10W panel of the mine.

The Company shall pay to the Union its costs in preparing and presenting this grievance. Such costs shall be reasonable and shall only be based on the documented fees, if any, the Union's legal team billed in assisting in the preparation of the grievance as well as the documented per hour cost of the work of Mr. Frey, who represented the Union here, in preparing and presenting this case. That latter amount shall be calculated on his hourly salary as a Union staff member and shall be based on a 40-hour work week. The cost shall not include any costs of witnesses, nor shall it include the Union's share of the undersigned's fees and expenses, as those must contractually be divided equally by the parties.

<u>May 8, 2018</u>　　　　　　　　　　　　　<u>*Ralph H. Colflesh, Jr., Esq.*</u> (signed electronically)
Date　　　　　　　　　　　　　　　　　Ralph H. Colflesh, Jr., Esq. /Arbitrator